## UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JEFFERY M. FLECKENSTEIN, | : | CIVIL NO: 1:14-CV-01085 |
| *Individually and as the Administrator* | : | |
| *of the Estate of Cherylann J. Dowell*, | : | (Judge Kane) |
| JEREMY M. FLECKENSTEIN, and | : | |
| JUSTIN A. FLECKENSTEIN, | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | |
| ROSS W. CRAWFORD, *et al.*, | : | (Magistrate Judge Schwab) |
| | : | |
| Defendants. | : | |

## <u>REPORT AND RECOMMENDATION</u>

In this case, the plaintiffs, Jeffery Fleckenstein, individually, and as the Administrator of the Estate of CherylAnn Dowell ("Dowell's Estate" or the "Estate"), Jeremy Fleckenstein, and Justin Fleckenstein, have filed a lawsuit involving constitutional and state law claims stemming from the death of Dowell, the Fleckensteins' biological mother, at the hands of her estranged boyfriend, Ross Crawford ("Crawford"). Pending before the Court is the moving defendants' motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.[1] For the following reasons, we recommend that the motion be granted in part and denied in part.

---

[1]    The pending dismissal motion involves the claims raised against all defendants, except Crawford.

## I.   <u>Background and Relevant Procedural History</u>.

The plaintiffs initiated this lawsuit on June 4, 2014, when they filed their complaint along with the requisite filing fee.   *Doc.* 1.   On June 5, 2014, summonses were issued to all defendants.   *Doc.* 2.   On July 18, 2014, counsel for all of the defendants, except Crawford, entered an appearance.[2]   *Doc.* 5.   On the same date, the plaintiffs filed an amended complaint.   *Doc.* 6.   Approximately one week later, after the amended complaint was filed, the moving defendants filed a motion to dismiss, *Doc.* 8, which is ripe for disposition on the merits and is the subject of this Report.

In the amended complaint, the plaintiffs name the following defendants: (1) Ross Crawford ("Crawford"), an adult presently imprisoned at York County Prison (the "Prison"); (2) Jane or John Does 1-20, employees of York County, Pennsylvania or the Pennsylvania Unified Judicial System[3]; (3) Mary Sabol ("Sabol"), Warden at the Prison; (4) Dana Brienza ("Brienza"), a York County Probation Officer; (5) Kim McDermott ("McDermott"), a York County Probation Officer; (6) K. Eyster ("Eyster"), a York County Probation or Parole Supervisor;

---

[2]   To date, Crawford, who waived service on July 24, 2014 (*Doc.* 11), has not filed a motion or responsive pleading to the plaintiffs' amended complaint.

[3]   Based on our reading of the amended complaint, the Jane or John Does 1-20 are alleged to be employees of either York County or the York County Adult Probation and Parole Department.   Accordingly, the Doe defendants will be deemed to be included as within the defendant groups as we have defined them in note 5 below.

(7) Albert Sabol ("Albert"), the Chief of the York County Adult Probation and Parole Department ("York County Probation/Parole Department"); (8) Mark Chronister ("Chronister"), a York County Commissioner; (9) Paul Hoke ("Hoke"), a York County Commissioner; (10) Christopher Reilly ("Reilly"), a York County Commissioner; (11) the York County Prison Board of Inspectors (the "Prison Board"); and (12) York County, the municipality.[4]

According to the plaintiffs, from 2009 to 2012, Crawford was arrested numerous times for committing violent crimes against Dowell.[5]  In relevant part, in 2010, Crawford was accused of taking Dowell hostage, assaulting her, and setting a fire at her home.  Then, in March 2011, Crawford pleaded guilty to terroristic threats, criminal mischief, and harassment, upon breaking into Dowell's home and threatening to assault her with a fireplace poker.  In a negotiated plea agreement, Crawford was sentenced to three years of probation, and he was ordered to have no contact with Dowell.  Approximately five months later, however, Crawford violated the conditions of his sentence, and he was then sentenced to six to 12 months of imprisonment, three years of probation, and again

---

[4]  Collectively, we refer to Brienza, McDermott, Eyster, and Albert as the "Probation/Parole Defendants."  In addition, we collectively refer to Chronister, Hoke, and Reilly as the "Commissioners."

[5]  In accordance with the motion-to-dismiss standard of review, we will accept the plaintiffs' allegations as true.  *See, infra*, Part II.

ordered to have no contact with Dowell.  Crawford failed to comply on a second occasion.

Specifically, on March 8, 2012, Crawford was arrested for disorderly conduct and harassment in another incident involving Dowell.  One week later, Crawford was detained at the Prison.  The Prison's records note that Crawford, who had a history of physically assaulting others, should not be allowed to have contact with Dowell.  The records further note that Crawford had a history of domestic violence.[6]  Subsequently, on May 14, 2012, Crawford was found guilty of the offenses for which he was arrested in March (i.e. disorderly conduct and harassment). One week later, on May 21, 2012, Judge Bortner of the York County Court of Common Pleas found that Crawford's most-recent convictions amounted to parole violations, and he issued an order containing the following language:

> [Crawford] is sentenced to the unserved balance of 396 days with reparole after six months of house confinement.
>
> Furthermore, Case 4868, Count 4, that is a sentence of three years' probation.  He is to receive credit from March 14th, 2012. That is 69 days, and he is reparoled forthwith.

---

[6]    Another note from the Prison, provides, "recommend violence prevention." The precise meaning of this note is unclear.  *Doc.* 6 at ¶ 27.

*Id.* at ¶ 30.[7]  Crawford was also prohibited from contacting Dowell until May 20,
2015.

On the same night Crawford was sentenced, he was released from the Prison
into the general community, not on house arrest, and with the defendants'
knowledge that he would not be properly monitored.   After being free for
approximately 18 days, Crawford entered Dowell's home and killed her using
blunt force.  On June 8, 2012, Crawford was arrested and charged with first-degree
murder.  The thrust of the plaintiffs' amended complaint is that Dowell's murder

---

[7]      Central to this case, and to the resolution of the instant motion to dismiss,
are the parties' divergent interpretations, not only of the meaning of Judge
Bortner's May 21, 2012 order, but of which document -- or documents --
constitutes such order.   In the amended complaint, plaintiffs quote the alleged
language of the order as provided here.  *Doc.* 6 at ¶ 30.  The plaintiffs have also
separately filed a document they identify as Exhibit 5, *Doc.* 14, that appears to be a
copy of an order by Judge Bortner dated May 21, 2012, and tracks the
aforementioned language as alleged in the amended complaint; however, the
plaintiffs do not refer to this exhibit in the amended complaint or in their brief in
opposition to defendants' motion to dismiss.  Similarly, the defendants append to
their brief in support of their motion to dismiss four pages of documents that they
argue constitute Judge Bortner's order applicable to this matter.  Yet, none of those
documents are authenticated, several of the pages contain handwritten notations,
and none of the pages is the same as that submitted by plaintiffs at *Doc.* 14.
Without the benefit of discovery, at this stage of the case, we are unable to
interpret such documents standing alone or in combination with one another.
Thus, while the Court may consider exhibits attached to a complaint, matters of
public record, and "an undisputedly authentic document" relied upon by the
plaintiff and attached as an exhibit to a defendant's motion to dismiss, *Pension
Benefit Guar. Corp. v. White Consol. Indus.*, 998 F.2d 1192, 1196 (3d Cir. 1993),
we do not consider the documents relied on by any of the parties herein.
Accordingly, we base our findings and recommendations in this Report on the
language of Judge Bortner's May 12, 2012 order *as alleged* in the amended
complaint and refer to such language herein as the "Alleged Order."

could have been prevented but for the defendants' actions, and if certain measures had been in place.

Against this backdrop, the plaintiffs also claim that Sabol is responsible for the day-to-day operations at the Prison, keeping inmates secure, and keeping the public safe from inmates. Sabol is also responsible for ensuring that correctional officers and supervisors are properly trained and supervised. According to the plaintiffs, however, Sabol "knew" that Prison employees, who were required to perform initial screenings and risk assessments for inmates, were not properly trained and were not doing their job properly. Consequently, Crawford's assessment contained incorrect information, and it did not provide officials at the Prison with an accurate assessment of the threat that Crawford posed to Dowell. Plaintiffs further allege that Sabol knew that, when released, Crawford would not be properly confined on house arrest or supervised in the community. These defendants allegedly knew this because they did not ensure that Crawford was subject to a proper probation or parole plan before he was re-released. Nor did they notify anyone at the York County Probation/Parole Department of Crawford's sentencing and immediate release. Dowell anticipated and expected to be notified in accordance with Pennsylvania law and York County policies, practices, and customs. According to the plaintiffs, the defendants' failure to follow their own victim notification policies and procedures  had become a practice at the Prison.

6

Furthermore, Sabol allegedly knew that in York County at the time, it typically took one to two weeks to set up an inmate on house arrest with electronic monitoring. Crawford, however, was released before any such system could be set up to monitor him.

The plaintiffs also raise allegations against the York County Probation/Parole Defendants. According to the plaintiffs, the York County Probation/Parole Department is generally responsible for supervising and monitoring inmates in the community, inmates sentenced to house arrest, and those out on probation or parole. In addition, York County Probation/Parole maintains a domestic violence unit comprised of probation officers who supervise inmates convicted of a domestic violence-related offense. Probation officers in the domestic violence unit typically follow risk and needs scales to determine the appropriate level of supervision. The plaintiffs allege that the Probation/Parole Defendants were either deliberately indifferent to those scales or ignored them altogether when evaluating Crawford.

The York County Probation/Parole Department also includes an intermediate punishment unit consisting of probation officers who interview and supervise offenders. The plaintiffs claim that the Probation/Parole Defendants either deliberately failed to perform their duties or deliberately ignored the information provided to them with respect to Crawford.

The intermediate punishment unit also oversees inmates on house arrest and those who are (or should be) subject to electronic monitoring.  When an inmate fails to abide by the terms of an intermediate-punishment sentence, the inmate is required to be immediately returned to prison.  According to the plaintiffs, the Probation/Parole Defendants allowed Crawford to leave house arrest, and they never set up electronic monitoring.  Moreover, the same defendants never had Crawford returned to prison for violating conditions of house arrest.

In support of their allegations against the Probation/Parole Defendants, the plaintiffs also provide that on May 21, 2012, Brienza noted in Crawford's Probation/Parole records that he was aware of Crawford's sentence through "court coverage."  On the following day, Brienza noted "new harassment charges – Same Vic[tim]."  Brienza further noted on May 22, that he had called Crawford to explain that he (Brienza) must meet with him (Crawford) one more time before being transferred to another officer once house arrest was imposed.  Subsequently, on May 23, Brienza noted that Crawford reported as directed, and that Crawford filled out a "new condition and payment agreement [for house arrest]." Brienza also noted "no vic[tim] contact." *Doc.* 6 at ¶¶ 69, 72.  In the event that Crawford's home was not set up to monitor him on house arrest, Brienza set up a follow-up appointment with Crawford that was scheduled for May 31.  As well, Brienza and

Eyster reviewed Crawford's file before turning it over to McDermott. *See id.* at ¶¶ 70, 71, 73.

The plaintiffs further allege that all of the defendants knew that it took a lengthy period of time to wire an inmate's home with electronic monitoring devices. Moreover, according to the plaintiffs, this was a result of the Commissioners' "failure" to "properly prioritize and fund" the York County Probation/Parole Department despite their knowledge about its financial needs. Moreover, the plaintiffs claim that the Commissioners' policymaking decisions, regarding the underfunding of the York County Probation/Parole Department, were misrepresented to the courts and the public.

Additionally, per the plaintiffs, the Prison Board allegedly failed to properly supervise the Prison, which resulted in the creation and implementation of policies and practices that permitted dangerous inmates to be released on house arrest without proper electronic or in-person monitoring and supervision. In a similar vein, the plaintiffs allege that the Prison Board did not implement any policies or practices to ensure that crime victims were timely notified of the impending or actual release of dangerous inmates or to ensure that affordable technological advancements would be implemented. The sum of these deficient, or lacking, policies and customs supposedly created the opportunity for Crawford to kill Dowell, which is what ultimately occurred.

Based on these factual allegations, Dowell's Estate raises the following claims: Count I – a violation of Dowell's substantive due process right to bodily integrity against the moving defendants, under the state-created-danger theory; Count II – municipal liability against York County and the Prison Board; and Count III – a survival action against all defendants.[8] Additionally, in Count IV, the Fleckensteins, in their individual capacities, assert a wrongful death claim pursuant to Pennsylvania's Wrongful Death Act.  By way of remedy, the plaintiffs seek declaratory and compensatory relief, as well as punitive damages (except as to York County).

## II.   <u>**Legal Standard.**</u>

Pursuant to the Federal Rules of Civil Procedure, a pleading must contain a "short and plain statement of the claim showing that the pleader is entitled to relief."  Fed.R.Civ.P. 8(a)(2).  As the Supreme Court held in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007), the pleading standard announced in Rule 8 does not require "detailed factual allegations."  A pleading that offers "labels and

---

[8]   In their brief-in-opposition, the plaintiffs state: "Count III, asserting a survival action, does not create a new independent claim; rather, it permits Counts I and II to proceed." *Doc.* 12 at 6.  As such, we will not construe the amended complaint to include any substantive claims arising under Pennsylvania's survival statute, other than those federal claims brought pursuant to 42 U.S.C. § 1983. *See also, Sullivan v. Warminster Tp.*, 765 F.Supp.2d 687, 707 (E.D. Pa. 2011)(explaining that a survival action is not a substantive cause of action; rather, it is an action that merely operates as "a vehicle through which plaintiffs can recover for unlawful conduct that results in death.").

conclusions" or a "formulaic recitation of the elements of a cause of action will not

do," however.  *Id.*  Nor does a complaint suffice if it tenders "naked assertion[s]"

devoid of "further factual enhancement."  *Id.* at 557.  Rather, to comply with Rule

8(a)(2) and withstand Rule 12(b)(6), the mechanism through which a party may

move to dismiss a pleading for failing to state a claim, a complaint must contain

sufficient factual matter accepted as true to "state a claim to relief that is plausible

on its face."  *Id.* at 570.

A claim has factual plausibility when the plaintiff pleads factual content that

allows the court to draw the reasonable inference that the defendant is liable for the

misconduct alleged.  *Id.* at 556.  In other words, this standard "asks for more than a

sheer possibility that a defendant has acted unlawfully."  *Ashcroft v. Iqbal*, 556

U.S. 662, 678 (2009).  "Determining whether a complaint states a plausible claim

for relief will be a context-specific task that requires the reviewing court to draw

on its judicial experience and common sense."  *Id.* at 679 (citation omitted).

Under this plausibility test, a court may not dismiss a complaint merely

because it appears unlikely or improbable that a plaintiff can prove the facts

alleged or will ultimately prevail on the merits.  *Twombly,* 550 U.S. at 556, 563 n.

8.  The test, instead, requires a federal court to ask whether the facts alleged raise a

reasonable expectation that discovery will reveal evidence of the necessary

elements.  *Id.* at 563 n. 8.  Accordingly, a complaint that provides adequate facts to

show "how, when, where, and why" will generally survive a Rule 12(b)(6) motion to dismiss.  *See Fowler v. UPMC Shadyside*, 578 F.3d 203 (3d Cir. 2009); *Guirguis v. Movers Specialty Services, Inc.*, 346 F. App'x 774 (2009).

"In keeping with these principles a court considering a [complaint under Rule 12(b)(6)] can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Iqbal,* 556 U.S. at 679.  Thereafter, "[if] well-pleaded factual allegations [are identified], a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id.*  Last, while a court resolving a Rule 12(b)(6) motion is traditionally focused upon the allegations contained in a complaint, a court may also consider exhibits attached to a complaint, matters of public record, and "an undisputedly authentic document" relied upon by the plaintiff and attached as an exhibit to a defendant's motion to dismiss. *Pension Benefit Guar. Corp. v. White Consol. Indus.*, 998 F.2d 1192, 1196 (3d Cir. 1993).

III.   **Discussion**.

In Counts I and II, Dowell's Estate brings claims under 42 U.S.C. § 1983, which provides, in pertinent part, that:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress….

*Id.* "Section 1983 is not a source of substantive rights, but merely a method to vindicate violations of federal law committed by state actors." *Pappas v. City of Lebanon*, 331 F.Supp.2d 311, 315 (M.D. Pa. 2004) (quoting *Gonzaga Univ. v. Doe*, 536 U.S. 273, 284–85 (2002)). To establish a claim under § 1983, a plaintiff must show that (1) the conduct complained of was committed by persons acting under color of state law; and (2) the conduct violated a right, privilege, or immunity secured by the Constitution or laws of the United States. *Harvey v. Plains Twp. Police Dep't*, 421 F.3d 185, 189 (3d Cir. 2005) (quoting *West v. Atkins*, 487 U.S. 42, 48 (1988)).  The Third Circuit has also explained: "[t]he first step in evaluating a [S]ection 1983 claim is to identify the exact contours of the underlying right said to have been violated and to [then] determine whether the plaintiff has alleged a deprivation of a constitutional right at all."  *Morrow v. Balaski*, 719 F.3d 160, 165-66 (3d Cir. 2013)(*en banc*)(internal quotations and

quoted case omitted).

In Count I, Dowell's Estate sets forth a substantive due process claim under the Fourteenth Amendment.  In Count II, Dowell's Estate brings a municipal liability claim.  In raising these § 1983 claims, the parties do not dispute that the amended complaint sufficiently satisfies the first element of a claim brought under § 1983.  To resolve the pending motion to dismiss, therefore, we are concerned solely with whether Dowell's Estate has plausibly shown a violation of federal law. In addition, Count IV involves a state-law wrongful-death claim brought by the Fleckensteins, as individuals.  All three claims will be addressed, *infra*.

## A. Standing.

Before turning to the substance of the claims raised in the amended complaint, we must first address several issues of preliminary concern that may cause each of the plaintiffs' claims to be dismissed or otherwise shield the moving defendants from liability.  To this end, the moving defendants contend that Dowell's Estate lacks standing to pursue the § 1983 claims.  *Doc.* 9 at 8. Similarly, the moving defendants also argue that the Fleckensteins lack standing to bring the § 1983 and wrongful death claims.

With respect to the Fleckensteins, they did not join in any of the § 1983 claims. *See Doc.* 6 at 19, 23, and 27; *Doc.* 12 at 7. The § 1983 claims, instead, are brought only by Dowell's Estate. Thus, the moving defendants' argument against the Fleckensteins must fail in this instance.

Regarding the wrongful death claim, Pa. R. Civ. P. 2202 provides that:

> (a) Except as otherwise provided in clause (b) of this rule, an action for wrongful death shall be brought only by the personal representative of the decedent for the benefit of those persons entitled by law to recover damages for such wrongful death.
>
> (b) If no action for wrongful death has been brought within six months after the death of the decedent, the action may be brought by the personal representative or by any person entitled by law to recover damages in such action as trustee ad litem on behalf of all persons entitled to share in the damages.
>
> (c) While an action is pending it shall operate as a bar against the bringing of any other action for such wrongful death.

Here, it is apparent that the wrongful-death claim was filed more than six months following Dowell's death. Thus, although the Fleckensteins are proper beneficiaries under the Pennsylvania Wrongful Death Act, an action for Dowell's wrongful death may be brought only by her personal representative or by an individual acting as a trustee *ad litem*. *See* Pa.R.Civ.P. 2202(b). The amended compliant fails to assert, however, whether any of the Fleckensteins are suing the moving defendants as Dowell's personal representative or as her trustee *ad litem*. Such noncompliance with Rule 2202 requires dismissal of the wrongful death

claim for lack of standing. The Fleckensteins should nonetheless be afforded leave to file a second amended complaint to clarify, if possible, the capacity of the plaintiff or plaintiffs bringing this claim and to ensure compliance with Rule 2202. *See Torres v. Brooks Armored Car Service Div.,* Civ. A. No. 93-5683, 1994 WL 143144, at *2-3 (E.D. Pa. April 12, 1994) (granting leave to amend complaint in light of uncertainty surrounding plaintiff's capacity to initiate a wrongful death claim).

Having addressed the standing issue with respect to the Fleckensteins, we turn to the same issue as it relates to Dowell's Estate and the § 1983 claims. Section 1983 explicitly delineates who is an appropriate plaintiff when a party survives his or her injuries, providing that state actors who infringe the constitutional or federal rights of an individual are liable "to the party injured." The express language of § 1983, however, makes no mention of who is a permissible plaintiff when the injured party dies from allegedly unlawful conduct on part of a state actor, which is the situation that we presently encounter.

In such a situation, the Supreme Court requires federal courts to look to the law of the forum as the principle reference point in order to determine who is a proper plaintiff and whether a decedent's § 1983 claims survive the decedent's death. *Robertson v. Wegmann*, 436 U.S. 584, 588-90, 593-94 (1978). Given that § 1983 actions are personal actions, the relevant state laws to examine are

16

generally the laws governing the survival of personal injury actions. Importantly, though, the survival laws of the forum must be consistent with the Constitution and federal law to permit a plaintiff, not the injured party, to have standing. *Id.*

Adhering to the charted course established in *Robertson*, we must examine Pennsylvania's survival statute for the inclusion of personal injury claims, as Pennsylvania is the forum state, and the Estate submits that the § 1983 claims are brought only in a survival capacity. *Doc.* 12 at 6. Pennsylvania's survival statute, 42 Pa. C.S.A. § 8302, provides: "All causes of action or proceedings, real or personal, shall survive the death of the plaintiff or of the defendant, or the death of one or more joint plaintiffs or defendants." The purpose of the statute is to compensate an estate for various categories of damage, including death, sustained by the decedent alone. *McClinton v. White*, 427 A.2d 218, 221 (Pa. Super. Ct. 1981) (citing *Frazier v. Oil Chemical Co.*, 179 A.2d 202 (Pa. 1962)); *see Sullivan v. Warminster Tp.*, 765 F.Supp.2d 687, 707 (E.D. Pa. 2011)(citations omitted). Thus, under 42 Pa. C.S.A. § 8302, a survival action "is brought by the administrator of the decedent's estate." *Kiser v. Schulte*, 648 A.2d 1, 4 (Pa. Super. Ct. 1994). In other words, "[t]he estate is substituted for the decedent, and its recovery is based upon the rights of action which were possessed by the decedent at his death." *McClinton*, 427 A.2d at 221.

Here, the § 1983 claims are properly raised by Dowell's Estate, in accordance with the standing requirements under Pennsylvania law, *via* the Commonwealth's survival statute.   Moreover, Pennsylvania's survival statute allows for a decedent's claims to survive his or her death, and it is consistent with federal law, especially 42 U.S.C. § 1983, in that the Pennsylvania survival statute is designed to provide remedies to individuals who have been killed or injured by unlawful conduct.  *See Sullivan,* 765 F.Supp.2d at 707; *see also, Jaco v. Bloechle*, 739 F.2d 239, 244-45 (6th Cir. 1984)(explaining the objective and purpose of § 1983); *see also, Andrews*, 253 F.3d at 1058 (citing *Berry v. City of Muskogee*, 900 F.2d 1489, 1503 (10th Cir. 1990)).   Accordingly, the moving defendants' motion to dismiss should be wholly denied on its standing defense as it relates to Dowell's Estate and the § 1983 claims.[9]

---

[9]      In the amended complaint, it is unclear whether Dowell died instantaneously.  Regardless, we find that the result in this case would be the same because the Pennsylvania courts have not interpreted the survival statute as foreclosing claims brought under the survival statute where death was instantaneous. *See generally, McIntyre v. Clark*, 461 A.2d 295 (Pa. Super. Ct. 1983) (reversing and remanding for a new trial on the issue of damages in a case where the decedent's estate brought a survival action resulting from the decedent's instantaneous death); *cf. Jaco*, 739 F.2d at 242 (interpreting Ohio's survival statute as foreclosing a claim where decedent's death was instantaneous and fashioning a federal remedy). Where death is instantaneous, the Pennsylvania courts, instead, have sought to limit the recovery of damages.  *See Fisher v. Dye*, 125 A.2d 472 (Pa. 1956); *Nye v. PennDOT*, 480 A.2d 318 (Pa. Super. Ct. 1984).

**B. Statute of Limitations.**

Given our recommendations in the previous subsection, only Counts I and II (the § 1983 claims) remain. As a second preliminary matter, the moving defendants next contend that the § 1983 claims are barred by the applicable statute of limitations.

On a Rule 12(b)(6) motion, a defendant can only prevail on the statute-of-limitations defense if a plaintiff's tardiness in bringing the action is apparent on the face of the complaint. *See Bethel v. Jendoco Const. Corp.*, 570 F.2d 1168, 1174 (3d Cir. 1978); *West Penn Allegheny Health System, Inc. v. UPMC*, 627 F.3d 85, 106 n. 13 (3d Cir. 2010). "When the applicability of the statute of limitations is in dispute, there are usually factual questions as to when a plaintiff discovered or should have discovered the elements of [his or her] cause of action, and thus defendants bear a heavy burden in seeking to establish as a matter of law that the challenged claims are barred." *Southern Cross Overseas Agencies, Inc. v. Wah Kwong Shipping Group Ltd.*, 181 F.3d 410, 425 (3d Cir. 1999)(citation omitted). Furthermore, in the context of § 1983 actions, the Third Circuit has explained:

The length of the statute of limitations for a § 1983 claim is governed by the personal injury tort law of the state where the cause of action arose. *Wallace v. Kato*, 549 U.S. 384, 387 (2007). The statute of limitations for a § 1983 claim arising in Pennsylvania is two years. 42 Pa. Cons.Stat. § 5524(2); *see also Kost v. Kozakiewicz*, 1 F.3d 176, 189–90 (3d Cir. 1993). Federal law governs a cause of action's accrual date. *Genty v. Resolution Trust Corp.*, 937 F.2d 899, 919 (3d Cir. 1991). Under federal law, a cause of action accrues, and the statute of limitations begins to run, "when the plaintiff knew or should have known of the injury upon which its action is based." *Sameric Corp. v. City of Philadelphia*, 142 F.3d 582, 599 (3d Cir. 1998) (citation omitted); *see also Montgomery v. De Simone*, 159 F.3d 120, 126 (3d Cir. 1998). The determination of the time at which a claim accrues is an objective inquiry; we ask not what the plaintiff actually knew but what a reasonable person should have known. *Barren v. United States*, 839 F.2d 987, 990 (3d Cir. 1988). As a general matter, a cause of action accrues at the time of the last event necessary to complete the tort, usually at the time the plaintiff suffers an injury. *See United States v. Kubrick*, 444 U.S. 111, 120 (1979). "The cause of action accrues even though the full extent of the injury is not then known or predictable. Were it otherwise, the statute would begin to run only after a plaintiff became satisfied that he had been harmed enough, placing the supposed statute of repose in the sole hands of the party seeking relief." *Wallace*, 549 U.S. at 391 (internal quotation marks and citations omitted).

*Kach v. Hose*, 589 F.3d 626, 634-45 (3d Cir. 2009).

In raising the statute-of-limitations defense in their dismissal motion, the moving defendants contend that the accrual date is May 21, 2012; the date that Crawford was sentenced for parole violations and released from prison without electronic monitoring. *Doc.* 9 at 9.  Therefore, since the initial complaint was not filed until June 4, 2014, *Doc.* 1, the moving defendants argue that the cause of

action is untimely.  *Id.*  Dowell's Estate, however, argues that the accrual date is the date of Dowell's death - June 8, 2012; the same date Crawford was also arrested and charged with first-degree murder.  *Doc.* 12 at 7.  Thus, according to the Estate, the cause of action was timely filed given that the initial complaint was filed on June 4, 2014.  *Id.*  With all of this in mind, we turn to the two § 1983 claims.

### 1.  The Estate's State-Created-Danger Claim.

To assert a meritorious state-created-danger claim, a plaintiff must sufficiently allege facts plausibly showing the existence of the following four elements:

> 1) the harm ultimately caused was foreseeable and fairly direct;
>
> 2) a state actor acted with a degree of culpability that shocks the conscience;
>
> 3) a relationship between the state and the plaintiff existed such that the plaintiff was a foreseeable victim of the defendant's acts, or a member of a discrete class of persons subjected to the potential harm brought about by the state's actions, as opposed to a member of the public in general; and
>
> 4) a state actor affirmatively used his or her authority in a way that created a danger to the citizen or that rendered the citizen more vulnerable to danger than had the state not acted at all.

*Bright v. Westmoreland Cnty.*, 443 F.3d 276, 281 (3d Cir. 2006) (citations and internal quotation marks omitted).  In order for the statute of limitations to bar a

state-created-danger claim, it must be apparent on the face of the complaint that the

moving defendants' alleged unlawful conduct *and* the harm suffered by an

individual occurred more than two years before the lawsuit was initiated.  *See*

*generally, Buchholz v. Midwestern Intermediate Unit IV*, 128 F. App'x 890, 893-

94 (3d Cir. 2005).[10]  In the amended complaint, it is only alleged that "[d]uring his

*few weeks of freedom*, Crawford … killed [Dowell]," and that "[o]n June 8, 2012,

… Crawford [was arrested] for the first-degree murder of [Dowell]."  *Doc.* 6 at ¶¶

---

[10]     In *Buchholz*, the Third Circuit held that the district court did not abuse its
discretion or commit any reversible error in instructing the jury on the statute-of-
limitations defense in relation to plaintiff's state-created-danger claim.   128 F.
App'x at 894-95.   The district court's instructions, in relevant part, were as
follows:

> Defendants assert two affirmative defenses. And, again, as I told
> you earlier, these must be proven by the defendants by a
> preponderance of the evidence.
>
> One is the statute of limitations. The other is qualified immunity.
> The first, the statute of limitations, is a law that provides that a
> claim is barred if a plaintiff does not bring it within a prescribed
> period. In this case, the statute of limitations is two years. This
> case was brought-it was filed in this Court on September 26,
> 2001. Thus if you find that none of defendants' conduct occurred
> after September 26, 1999, *and* if you find that plaintiff was not
> injured after September 26, 1999, then you must find that
> plaintiff's claims are barred by the statute of limitations.

128 F.App'x at 893 (emphasis added).   In holding that the instructions were
proper, the Third Circuit also commented that the district court's instructions
"operated to deem Plaintiff's claim timely so long as *any element of her state
created danger claim* fell within the requisite limitations period."   *Id.* at 894
(emphasis added).

87, 91 (emphasis added). Nowhere in the amended pleading is the date of Crawford's attack of Dowell, which culminated in her death, i.e., the harm, specifically or impliedly alleged.[11] As such, it is not apparent on the face of the amended complaint that the harm to Dowell occurred more than two years prior to the initiation of this lawsuit, for the harm to Dowell could have occurred at any point between June 4 and 8, 2012, making this claim timely filed in light of the fact that the initial complaint was filed on June 4, 2014. The Estate's state-created-danger claim should therefore proceed.

### 2. The Estate's Municipal Liability Claim.

Again, for the reasons stated, *supra*, it is not apparent from the face of the amended pleading that Dowell's injury – that is, Crawford's attack on her that culminated in her death, *see Doc.* 6 at ¶ 111 & *Doc.* 12 at 7 – occurred more than two years before this lawsuit was initiated. *See Garvin v. City of Phila.*, 354 F.3d 215, 220 (3d Cir. 2003)(providing that the statute of limitations for a plaintiff's *Monell* claim is two years); *see also, Clark v. City of Phila.*, No. 13-2204, 2013 WL 5780795, at * 4 (E.D. Pa. Oct. 25, 2013)(finding plaintiff's *Monell* claim to be barred under the statute of limitations when said claim was based upon "the events

---

[11]     In their brief-in-opposition, the plaintiffs aver that Dowell died on June 8, 2012, as set forth in Dowell's death certificate, *Doc.* 12 at 7; however, such a fact is not alleged in the amended complaint. Moreover, it is axiomatic that a pleading may not be amended *via* a brief. Thus, we do not consider the plaintiffs' averment in this Report.

that occurred *and the injury* plaintiff allegedly suffered….")(emphasis added).  As such, this claim should also proceed.

### 3. The Estate's Claims against Brienza, McDermott, and Eyster.

Brienza, McDermott, and Eyster further argue that any § 1983 claim against them should be dismissed as untimely because they were not identified, or named, as defendants until the amended complaint was filed, after the statute of limitations had unquestionably expired.[12]  *Doc.* 9 at 9.  In a situation such as this we turn to Rule 15(c) of the Federal Rules of Civil Procedure.  *See Singletary v. Pa. Dept. of Corr.*, 266 F.3d 186, 193 (3d Cir. 2001)("Rule 15(c) can ameliorate the running of the statute of limitations on a claim by making the amended claim relate back to the original, timely complaint.").

Federal Rule of Civil Procedure 15(c), in relevant part, provides the following:

> **(c) Relation Back of Amendments.**
>
> **(1) When an Amendment Relates Back.** An amendment to a pleading relates back to the date of the original pleading when:
>
> * * *
>
> (B) the amendment asserts a claim … that arose out of the conduct, transaction, or occurrence set out—or attempted to be set out—in the original pleading; or

---

[12]     At minimum, the parties do not dispute that the statute of limitations expired by June 8, 2014.  *See Doc.* 9 at 9; *Doc.* 12 at 7-8.

(C) the amendment changes the party or the naming of the party against whom a claim is asserted, if Rule 15(c)(1)(B) is satisfied and if, within the period provided by Rule 4(m) for serving the summons and complaint, the party to be brought in by amendment:

(i) received such notice of the action that it will not be prejudiced in defending on the merits; and

(ii) knew or should have known that the action would have been brought against it, but for a mistake concerning the identity of the proper party's identity.

Fed.R.Civ.P. 15(c)(1).[13]

Under the first condition, it is readily apparent that the Estate's § 1983 claims against Brienza, McDermott, and Eyster arise out of the same conduct and occurrences set forth in the initial complaint, and the parties, respectively, do not dispute this point.  The second condition -- requiring notice within 120 days of the filing of the action in order to avoid prejudice -- is the heart of this relation-back analysis.  *Schiavone v. Fortune*, 477 U.S. 21, 31 (1986).  Notice may either be actual or constructive.  *Singletary*, 266 F.3d at 195.  Moreover, the notice must be that the lawsuit has been brought, not simply that the event giving rise to the cause

---

[13]     Rule 4(m) of the Federal Rules of Civil Procedure provides, in part:

If a defendant is not served within 120 days after the complaint is filed, the court – on motion or on its own after notice to the plaintiff – must dismiss the action without prejudice against that defendant or order that service be made within a specified time. But if the plaintiff shows good cause for the failure, the court must extend the time for service for an appropriate period.

of action occurred. *Lockwood v. City of Phila.*, 205 F.R.D. 448, 451-52 (E.D. Pa. 2002)(citing *Singletary*, 266 F.3d at 195).

Here, there is little question that Brienza, McDermott, or Eyster had actual notice of the filing of this lawsuit, within the 120-day time period set by Rule 4(m). According to the docket, the initial complaint was filed on June 4, 2014. *Doc.* 1. Under Rule 4(m), therefore, Brienza, McDermott, and Eyster were required to be put on notice that this lawsuit was brought on or before October 2, 2014. Counsel for the moving defendants, Michael Flannelly ("Flannely"), entered an appearance on July 18, 2014. *Doc.* 5. On the same date Flannelly entered his appearance, the plaintiffs filed the current amended complaint, *Doc.* 6, and three days later, Flannelly entered his appearance for Brienza, McDermott, and Eyster. *Doc.* 7. Flannelly's appearance on behalf of Brienza, McDermott, and Eyster occurred many days in advance of the 120-day deadline set by Rule 4(m), and leaves us with no doubt that Brienza, McDermott, and Eyster were put on actual notice of the initial filing, within the relevant time period, such that they would not be prejudiced in defending this lawsuit on the merits.[14]

---

[14]    It could also be said that Brienza, McDermott, and Eyster were put on constructive notice *via* the "shared attorney" method. *See Garvin*, 354 F.3d at 225 (explaining that under the "shared attorney" method, "the fundamental issue…is whether the attorney's later relationship with the newly named defendant[(s)] gives rise to [an] inference that the attorney, *within the 120 day period, had some communication or relationship with, and thus gave notice of the action to the*

Last, to satisfy the third condition of the relation-back doctrine, "the plaintiff must demonstrate that a mistake concerning the *identity* of the proper party existed at the time the complaint was filed." *Schach v. Ford Motor Co.*, 210 F.R.D. 522, 527 (M.D. Pa. 2002)(emphasis in original)(citing *Nelson v. County of Allegheny*, 60 F.3d 1010, 1014 (3d Cir. 1995)).   Here, the amended complaint contains allegations, or otherwise demonstrates, a mistake in the initial complaint as to the identities of Brienza, McDermott, and Eyster, as each of these newly named defendants is substituted for a fictitious defendant identified as a party in the initial complaint.  *Compare, e.g., Doc.* 1 at ¶¶ 8, 49, 51, 54, *with Doc.* 6 at ¶¶ 10-12, 59, 61.   Thus, the third condition has likewise been satisfied and the amendments should relate back to the filing of the initial complaint, making the amendments timely. *See Singletary*, 266 F.3d at 200-01 (noting Rule 15(c)(1)(C)(ii) may be satisfied when a plaintiff lacked knowledge of the identity of a Doe defendant when the initial complaint was filed); *cf. DiLauri v. Mullen*, 477 F. App'x 944, 947 (3d Cir. 2012)(per curiam)(agreeing with the Magistrate Judge's finding that the claims against the newly named defendants did not relate back because it was not a case of mistaken identity).

In sum, the moving defendants' motion to dismiss, on the basis that the statute of limitations has expired, should be denied.

---

*newly named defendant[(s)].*")(emphasis in original)(quoting *Singletary*, 266 F.3d at 196-97).

### C. Eleventh Amendment Sovereign Immunity.

The Probation/Parole Defendants next argue that all claims against them should be dismissed with prejudice pursuant to Eleventh Amendment sovereign immunity. *See Doc.* 9 at 10. This argument, however, can be easily cast aside, for the Eleventh Amendment does not bar state or federal claims raised against state officials sued in their individual capacities. *See Hafer v. Melo*, 502 U.S. 21, 31 (1991) (holding that state officials, sued in their *individual* capacities, are "persons" within the meaning of § 1983, and that the Eleventh Amendment does not bar such suits). In the amended complaint, all of the moving defendants are sued in their individual capacities only, and the plaintiffs do not otherwise raise claims against the Commonwealth or Commonwealth agencies. *See Doc.* 6 at ¶¶ 8, 10, 11, 12, 13. The moving defendants' motion to dismiss, consequently, should be denied on this issue.[15]

---

[15] The moving defendants also argue that Eleventh Amendment immunity applies to the York County Probation/Parole Department. *Doc.* 9 at 10. The plaintiffs do not disagree. *Doc.* 12 at 8-9. The plaintiffs, however, point out that York County Probation/Parole Department is not named as a defendant in this lawsuit. Thus, the argument asserted by the moving defendants is equally meritless.

### D. Absolute Immunity.[16]

Next, the individually-named moving defendants argue, collectively, that their alleged actions are otherwise shielded from liability pursuant to "absolute or judicial" immunity. *See Doc.* 9 at 10-11.  The Commissioners seek quasi-judicial absolute immunity, contending that they acted in roles functionally comparable to that of a judge, while Sabol and the Probation/Parole Defendants seek absolute immunity for acting under the authority of a facially valid court order.  *Id.*

Quasi-judicial immunity is a derivative form of judicial immunity, which itself is a form of absolute immunity.  The Supreme Court has described judicial immunity as affording to judges absolute immunity from civil liability under § 1983 "for acts committed within their judicial jurisdiction." *Pierson v. Ray*, 386 U.S. 547, 554 (1967).  Quasi-judicial immunity, on the other hand, is reserved for nonjudicial officials whose duties may "have an integral relationship with the judicial process." *Davis v. Borough*, 669 F.Supp.2d 532, 533-34 (E.D. Pa. 2009)(quoting *Ashbrook v. Hoffman*, 617 F.2d 474, 476 (7th Cir. 1980).  "This type of immunity was established to prevent a nonjudicial officer who is delegated

---

[16]      While the moving defendants lack precision in articulating the point, we presume that they do not intend on raising this defense with respect to York County and the Prison Board, for it is well-established that municipalities are not entitled to absolute immunity. *See Owen v. City of Independent, Mo.*, 445 U.S. 622, 657 (1980); *Carver v. Foerster*, 102 F.3d 96, 102 (3d Cir. 1996); *Aitchison v. Raffiani*, 708 F.2d 96, 100 (3d Cir. 1983).

judicial duties in aid of the court [from becoming] a lightning rod for harassing litigation aimed at the court." *Davis*, 669 F.Supp.2d at 534 (alteration in original, internal quotations omitted, and internal citations omitted).   When examining the quasi-judicial immunity defense, in the context of a Rule 12(b)(6) motion, the existence of such immunity must clearly appear on the face of the complaint. *See Wilson v. Rackmill*, 878 F.2d 772, 775-76 (3d Cir. 1989).

Turning first to the immunity defense as raised by the Commissioners, we find they have failed to show that the amended complaint includes any allegations that they engaged in an act functionally comparable to that of a judge.   *See Burns v. Reed*, 500 U.S. 478, 586 (1991) ("[T]he official seeking absolute immunity bears the burden of showing that such immunity is justified for the function in question.").   In fact, we construe the allegations in the amended complaint to be aimed principally at the legislative or executive functions of these defendants, such as their exercise of control over York County's budget.   Moreover, as it relates to the claim that these defendants mislead the courts, there are no allegations in the amended complaint to otherwise suggest that in so doing they were acting in a judicial, or quasi-judicial, capacity.   Consequently, the defense of quasi-judicial immunity should be denied with respect to the Commissioners.

The remaining, individually named defendants, Sabol and the Probation/Parole Defendants, argue that they acted pursuant to the documents they attach to their motion to dismiss, which they describe as a facially valid court order, and, therefore, they argue they are entitled to absolute immunity. *See Doc.* 9 at 5. Absolute immunity may apply in a § 1983 case for damages when a state actor takes action pursuant to a facially valid court order. *Hamilton v. Leavy*, 322 F.3d 776, 783 n. 5 (3d Cir. 2003) (noting the distinction between absolute immunity and quasi-judicial immunity). Determining the meaning of a court order and whether a defendant is entitled to absolute immunity for acting pursuant to such order is a question of law; however, such legal determinations regarding absolute immunity may involve factual disputes which must initially be resolved. *Id.* at 783. Sabol and the Probation/Parole Defendants insist that they acted pursuant to a court order, or orders, which they attach to their motion. For the reasons stated in Note 7, *supra*, we decline to consider such documents in addressing this motion to dismiss; therefore, we recommend that Sabol's and the Probation/Parole Defendants' motion to dismiss based on their entitlement to absolute immunity be denied. *See id.* 782-84 (resolving the issue of absolute immunity on a motion for summary judgment with the benefit of the colloquy between the parties and the court); *accord id.* at 780 n 3.

### E. Qualified Immunity.[17]

We now examine the individually-named moving defendants' argument that they should be cloaked with qualified immunity, "[g]iven the[ir] reasonable conduct" in implementing and enforcing Crawford's sentencing order, pursuant to their interpretation of the same. *Doc.* 9 at 11-12. The Third Circuit recently explained:

> "The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). To resolve a claim of qualified immunity, a court must engage in a two-pronged analysis to decide (1) whether the plaintiff alleged sufficient facts to establish the violation of a constitutional right, and (2) whether the right was "clearly established" at the time of the defendant's actions. *Id.* at 232.

*Estate of Lagano v. Bergen County Prosecutor's Office*, 769 F.3d 850, 858 (3d Cir. 2014)(Vanaskie, J.). Importantly, with respect to the second prong, there does not need to be a case directly on point, "but existing precedent must have placed the statutory or constitutional issue beyond debate." *Ashcroft v. al-Kidd*, 131 S.Ct. 2074, 2080 (2011). Moreover, a federal court is no longer required to conduct

---

[17]   As with the moving defendants' request for quasi-judicial immunity, *supra*, we presume they did not intend the qualified immunity defense to cover York County or the Prison Board. "It is well-established that no qualified immunity defense exists for municipalities under 42 U.S.C. § 1983." *Beckinger v. Township of Elizabeth*, 434 F. App'x 164, 169 n. 3 (3d Cir. 2011)(citing *Owen v. City of Independence, Mo.*, 445 U.S. 622, 638 n. 18 (1980)).

these two inquiries sequentially, *Pearson v. Callahan*, 555 U.S. 223, 239–40 (2009), and it may forego difficult constitutional issues and award qualified immunity to a defendant if it is apparent that the defendant did not violate rights that were clearly established at the time the defendant acted. *Id.* Last, with respect to the § 1983 claim against the individually named moving defendants, "[t]he focus of the qualified immunity inquiry is on the allegations made by [Dowell's Estate]. Specifically, the question is whether the facts averred by the [Estate] fall within the elements of the state-created-danger theory, and whether 'it would be clear to a reasonable officer' that the [conduct alleged] was unlawful under the circumstances." *Lagano,* 769 F.3d at 859 (quoting *Saucier v. Katz*, 533 U.S. 194, 202 (2001)).

Given the moving defendants' attack on the underlying state-created-danger claim, in addition to their argument that they acted reasonably under the circumstances, we proceed to address both qualified-immunity inquiries.

## 1.  The Violation of a Constitutional or Federal Right.

As stated, *supra,* the § 1983 claim raised by Dowell's Estate against the individually-named moving defendants rests on the substantive component of the Fourteenth Amendment's Due Process Clause.  The Due Process Clause provides that a state shall not "deprive any person of life, liberty, or property, without due process of law."   U.S. CONST. Amend XIV, § 1.   In turn, the substantive

33

component of due process "protects individual liberty against 'certain government actions regardless of the fairness of the procedures used to implement them.'" *Collins v. City of Harker Heights*, 503 U.S. 115, 125 (1992)(quoting *Daniels v. Williams*, 474 U.S. 327, 331 (1986)); *see also, Ye v. United States*, 484 F.3d 634, 636 (3d Cir. 2007)(providing that there is a substantive component to the Due Process Clause such that it "prevents the Government from abusing its power or using it as an instrument of oppression."). Furthermore, "[i]ndividuals have a constitutional liberty interest in personal bodily integrity that is protected by the Due Process Clause of the Fourteenth Amendment." *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 235 (3d Cir. 2008). While "a [s]tate's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause," *DeShaney v. Winnebago Cnty. Dep't of Social Services*, 489 U.S. 189, 197 (1989), an exception to this rule arises under the doctrine of state created danger, which can be "'utilized to find a constitutional tort duty under § 1983 outside of a strictly custodial context.'" *Moeck v. Pleasant Valley Sch. Dist.*, 983 F. Supp.2d 516, 526 (M.D. Pa. 2013) (quoting *D.R. by L.R. v. Middle Bucks Area Vocational Tech. Sch.*, 972 F.2d 1364, 1373 (3d Cir. 1992)); *see also Kneipp v. Taylor*, 95 F. 3d 1199, 1205, 1211 (3d Cir. 1996) (holding that the state-created-danger theory is a "viable mechanism for establishing a constitutional claim under

42 U.S.C. § 1983," where state action creates plaintiff's danger or renders him or her more vulnerable to it).

Here, in support of its due process claim, Dowell's Estate alleges that all of the individually-named moving defendants caused Dowell's death by releasing Crawford to the general community, without notifying Dowell of Crawford's release, without placing him on electronic monitoring and house arrest, and without properly supervising him, all in violation of the Alleged Order. In addition, the Estate's due process claim is premised upon the allegation that the Commissioners did not properly fund the York County Probation/Parole Department and led state court judges and the public to erroneously believe that house arrest was a viable sentencing option.

To assert a meritorious state-created-danger claim, a plaintiff must sufficiently allege facts plausibly showing the existence of the following four elements:

1) the harm ultimately caused was foreseeable and fairly direct;

2) a state actor acted with a degree of culpability that shocks the conscience;

3) a relationship between the state and the plaintiff existed such that the plaintiff was a foreseeable victim of the defendant's acts, or a member of a discrete class of persons subjected to the potential harm brought about by the state's actions, as opposed to a member of the public in general; and

4) a state actor affirmatively used his or her authority in a way that created a danger to the citizen or that rendered the citizen more vulnerable to danger than had the state not acted at all.

*Bright*, 443 F.3d at 281.

To satisfy the first element of a state-created-danger claim, a plaintiff must plead that the harm caused was a "foreseeable and fairly direct" consequence of a defendant's actions. "To adequately plead foreseeability … a plaintiff [must] allege … an awareness of risk that is sufficiently concrete to put the [state] actors on notice of the harm." *Henry v. City of Erie*, 728 F.3d 275, 282-83 (3d Cir. 2013)(quoted case omitted).

In moving to dismiss the state-created-danger claim against them, the defendants shift the focus to Judge Bortner and argue that it was incumbent upon him to foresee any harm to Dowell at Crawford's hands because they were not vested with the discretion to determine the foreseeability of Crawford's action. In the amended complaint, however, the Estate alleges that Crawford was incarcerated for violating his parole as a result of multiple violent crimes against

36

Dowell. *Doc.* 6 at ¶¶ 19-29. The Estate further alleges that the defendants knew that Crawford would likely hurt Dowell which is why they imposed a no-contact order upon him. *Id.* at ¶¶ 19-31. Indeed, Crawford was arrested numerous times between 2009 and 2012 as a result of multiple crimes he committed against Dowell. *Id.* at ¶¶ 19-24. In fact, Crawford's arrest on March 8, 2012, stemmed from his disorderly conduct and harassment in an incident involving Dowell. *Id.* at ¶ 25. In light of the foregoing, we reject defendants' contentions in this regard and find that the Estate has adequately alleged Sabol's and the Probation/Parole Defendants' awareness of Crawford's violent propensities toward Dowell. Thus foreseeability is properly alleged here. *Cf. Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902, 908 (3d Cir. 1997)(holding, among other things, that the defendants could not have foreseen that the use of an unlocked back entrance for access to the school building would result in the murderous act of a mentally unstable third party).

As to the requirement in the first element that the harm caused be "fairly direct," "the plaintiff must plausibly allege that state officials' actions 'precipitated or w[ere] the catalyst for' the harm for which the plaintiff brings suit." *Henry*, 728 F.3d at 285 (alteration in original) (quoting *Morse*, 132 F.3d at 910). "Precipitate … means to cause to happen or come to a crisis suddenly, unexpectedly, or too soon." *Id*. (quoted sources omitted). It does not suffice to plead that state

officials' actions took place somewhere along the causal continuum that ultimately led to a plaintiff's harm. *Id.* A plaintiff must allege facts to show that defendants' actions were "close in time and succession to the ultimate harm." *See Henry*, 728 F.3d at 285. In other words, "[t]his inquiry essentially asks whether the alleged misconduct and the harm caused were 'too attenuated' to justifiably hold the defendant liable." *D.N. and S.N. v. Snyder,* 608 F. Supp.2d 615, 625 (M.D. Pa. 2009)(Conner, C.J.)(citing *Phillips*, 515 F.3d at 239).

Again, the moving defendants argue that Judge Bortner ordered Crawford released on May 21, 2012; therefore, *he* was the catalyst for the harm in this matter. Based upon the allegations in the amended complaint, however, we find that the Estate has sufficiently alleged that the harm to Dowell was a "fairly direct" consequence of the actions allegedly committed by Sabol and the Probation/Parole Defendants. This is especially true, whereas here, the Estate alleges that the Alleged Order did not require Crawford's immediate release and that any release of Crawford should have been to house arrest, rather than to the general community. *See Doc.* 6 at ¶ 36, 37. The Estate further alleges that the Probation/Parole Defendants were responsible for supervising Crawford upon his release and, despite their awareness of his prior criminal acts of violence toward Dowell, they allowed him to leave his home on occasion during the 18-day period between his release and his arrest. *See Doc.* 6 at ¶¶ 37, 47, 65. Moreover, mere

randomness is not at work here.  Dowell and Crawford were in a long-term, albeit estranged, relationship, the nature of which was allegedly well-known to these defendants, and Dowell's death occurred within an 18-day period after Sabol's release of Crawford from prison and while under the Probation Defendants' supervision.  *See Caissie v. City of Cape May,* 619 F. Supp. 2d 110, 119 (D.N.J. 2009) (stating that there is a difference "between harm that occurs to an identifiable or discrete individual under the circumstances and harm that occurs to a random individual with no connection to the harm-causing party.") (quoting *Morse*, 132 F. 3d at 909).  Moreover, at this early stage of the litigation, we cannot necessarily conclude that the Probation/Parole Defendants' alleged failure to properly supervise Crawford upon his release from the Prison renders Sabol's alleged act of releasing him early from the Prison, in violation of the Alleged Order, was too attenuated from the ultimate harm to justifiably hold her liable. Indeed, Sabol does not raise this argument in support of her dismissal motion.

As to the Commissioners, we come to a different conclusion.  First, as a matter of law, these defendants likely had no control or authority over York County Probation/Parole or its employees since the department is part of Pennsylvania's unified court system, and thus under the control of the Commonwealth.  *See Hayberger v. Lawrence County Adult Probation and Parole*, 551 F.3d 193, 198 (3d Cir. 2008) ("Pennsylvania's judicial districts, including their

probation and parole departments, are part of the Commonwealth government rather than local entities."). Second, accepting the allegations against these defendants as true, with respect to their alleged underfunding of York County Probation/Parole and their misleading of both the courts and the public, we find that the amended complaint fails to include allegations to plausibly suggest that they took any of those actions close in time and succession to Dowell's death. Rather, the amended complaint leaves the defendants with having to guess when said actions occurred, raising the specter of doubt as to the plausibility of the claim against the Commissioners. Accordingly, we recommend that the state-created-danger claim against the Commissioners be dismissed. Dowell's Estate, however, has otherwise satisfied the first element as to Sabol and the Probabtion/Parole Defendants.

The second prong of the state-created-danger theory asks whether the state official acted in willful disregard for the plaintiff's safety, *Phillips*, 515 F.3d at 235, which requires that "a state actor act[] with a degree of culpability that shocks the conscience." *Bright*, 443 F.3d at 281. "The exact degree of wrongfulness necessary to reach the 'conscience-shocking' level [however] depends upon the circumstances of a particular case, and depends in particular on 'the extent to which a state actor is required to act under pressure." *Walter v. Pike County, Pa.*, 544 F.3d 182, 192 (3d Cir. 2008)(quoted cases omitted). In a "hyperpressurized

environment" an intent to cause harm is usually required, while "in cases where deliberation is possible and officials have the time to make 'unhurried judgments,' deliberate indifference is sufficient." *Id.*   Under "circumstances involving something less urgent than a 'split-second' decision but more urgent than an 'unhurried judgment,'" [however] there is a mid-level standard that requires gross negligence and arbitrariness -- the state actor must "consciously disregard[ ] a great risk of serious harm." *Id.* at 192-93 (quoting *Sanford*, 456 F.3d at 308)(internal citation omitted).

Here we find that the application of the deliberate indifference standard is appropriate.   The moving defendants were not confronted with split second decision-making, but rather they had time to deliberate before releasing Crawford from prison and before allowing him to leave his home without proper supervision. Thus, "the relevant question is whether the [defendants] consciously disregarded a great risk of harm. . . [knowing that] it is possible that actual knowledge of the risk may not be necessary where the risk is 'obvious.'" *Sanford v. Stiles*, 456 F. 3d 298, 310 (3d Cir. 2006) (citations omitted); c*ompare Kaucher v. County of Bucks,* 455 F.3d 418, 426 (3d Cir. 2006) (discussing the hyperpressurized situation of a high-speed chase) *with Miller v. City of Philadelphia*, 174 F.3d 368, 375 (3d Cir. 1999) (applying the mid-level standard to a social worker's removal of a child).

The allegations in the amended complaint plausibly show that these moving defendants not only had knowledge of Crawford's history of violence toward Dowell, and that no-contact orders had been entered, but that they were also aware of the risk inherent in allowing Crawford to leave his home without proper supervision. Despite such knowledge, the Estate alleges that Sabol allegedly released Crawford to the community in violation of the Alleged Order. The Estate further alleges that the Probation/Parole Defendants allowed Crawford to leave his house, also in direct violation of the Alleged Order. Subsequently, while out of the house, under supervision that was allegedly improper, Crawford killed Dowell. Upon these allegations, we find that Dowell's Estate has met its burden on the second element of sufficiently alleging conduct on the part of the moving defendants that plausibly rises to the level of deliberate indifference that could be described as conscious shocking.

The third element of the state-created-danger theory requires a plaintiff to allege the existence of "a relationship between the state and the person injured … during which the state places the victim in danger of a foreseeable injury." *Kneipp,* 95 F.3d at 1209 n. 22 (stating that [t]he relationship requirement under the state-created-danger theory contemplates some contact such that the plaintiff was a foreseeable victim of a defendant's acts in a tort sense). This element excludes cases "where the state actor creates only a threat to the general population."

*Morse,* 132 F.3d at 912 (citing *Martinez v. California*, 444 U.S. 277, 285 (1980)). "[I]n certain situations, [a plaintiff may] bring a state-created danger claim if the plaintiff was a member of a discrete class of persons subjected to the potential harm brought about by the state's actions." *Morse*, 132 F.3d at 913; *see also Phillips*, 515 F.3d at 242 ("The relationship that must be established between the state and the plaintiff can be 'merely' that the plaintiff was a foreseeable victim, individually or as a member of a distinct class.").

In this instance, the amended complaint is rife with allegations showing that Dowell had a relationship with the state as a victim of a crime, and that Sabol and the Probabtion/Parole Defendants placed Dowell in danger of foreseeable injury. The amended complaint includes allegations that: (1) Crawford had harassed Dowell on several occasions and committed violent acts against her; (2) Crawford was subject to a sentence of the unserved balance of 396 days imprisonment and six months house arrest for having harassed Dowell; (3) the moving defendants, respectively, were aware of Crawford's previous violent, criminal conduct toward Dowell; (4) no-contact orders were put in place to protect Dowell; and (5) the moving defendants, respectively, did not comply with the Alleged Order by failing to inform Dowell that Crawford had been released from the Prison and further failing to place Crawford under proper supervision. Moreover, it is alleged that upon failing to place Crawford under proper supervision, and allowing him to

leave his home on occasion, he eventually attacked and killed Dowell.

As such, we find that Dowell's Estate has satisfied the third element with respect to Sabol and the Probation/Parole Defendants. *See, e.g., Petrone v. Pike County Probation Department*, 240 F.Supp.2d 317, 320-21 (M.D. Pa. Dec. 27, 2002)(Jones, J.)(distinguishing *Martinez* and allowing the plaintiffs' state-created-danger claim to proceed wherein it was alleged that the defendants failed to inform the wife of her husband's long history of violent behavior towards women with which he was romantically involved); *cf. Martinez*, 444 U.S. 277 (1980)(rejecting the plaintiffs' claims and stating that "the parole board was not aware that appellant's decedent, as distinguished from the public at large, faced any special danger."); *Commonwealth Bank & Trust Co. v. Russell*, 825 F.2d 12 (3d Cir. 1987)(holding that prison officials were not liable on the grounds that, among other things, they could not have known that decedents faced any particular threat greater than that faced by the public at large).

Finally, liability under the fourth element of a state-created-danger claim is predicated on a state actor affirmatively acting or using his or her authority to "create an opportunity for danger that otherwise would not have existed." *Rivas v. City of Passaic*, 365 F.3d 181, 195 (3d Cir. 2004). The Third Circuit has acknowledged that the line between action and inaction is not always clear, but emphasized that it has never found a state-created danger claim to be meritorious

44

without an allegation and subsequent showing that state authority was affirmatively exercised in some way. *Bright,* 443 F.3d at 282; *Phillips,* 515 F.3d at 235–36. The Third Circuit has further stressed that state actors cannot utilize their authority to create such an opportunity for injury to a plaintiff by failing to act. *Bright*, 443 F.3d at 282 n. 6 (confirming that the controlling precedent in the Third Circuit on the fourth element of the state-created-danger claim is the *en banc* decision in *D.R. by L.R. v. Middle Bucks Area Vo. Tech. School,* 972 F.2d 1364, 1374 (3d Cir.1992) and finding no conflict between the *D.R.* fourth element phrasing of state's affirmative acts and those cases phrasing the fourth element "in terms of whether 'state actors used their authority' to create an opportunity that would not otherwise have existed' for injury to the plaintiff") (internal citations omitted). The fourth element also requires "a direct causal relationship between the affirmative act and plaintiff's harm." *Phillips*, 515 F.3d at 236. In sum, "the three necessary conditions to satisfy the fourth element … are that: (1) a state actor exercised his or her authority, (2) the state actor took an affirmative action, and (3) this act created a danger to the citizen or rendered the citizen more vulnerable to danger than if the state had not acted at all." *Ye*, 484 F.3d at 639 (citing *Bright,* 443 F.3d at 281-82); *see also Phillips v. County of Allegheny*, 515 F.3d 224, 235 (3d Cir. 2008) ("It is the misuse of state authority, rather than a failure to use it, that can violate the Due Process Clause.").

Mindful that many state-created danger claims fall short of adequately pleading that state defendants acted affirmatively, we, nevertheless, find that the Estate has cleared the hurdle on the fourth element and are constrained to recommend that the Court deny the moving defendants' motion to dismiss this claim prior to discovery being taken.  At this early stage, and especially in light of the obvious issues surrounding Crawford's sentence, which is highly applicable to this case, we do not agree that the amended complaint should be dismissed because it contains insufficient allegations of affirmative conduct.  While many of the allegations in the amended complaint are aimed at the defendants' inaction, the Estate has adequately pleaded affirmative acts on the part of Sabol, who released Crawford in contravention of the Alleged Order, *Doc.* 6 at ¶ 36, and the Probation/Parole Defendants, who "knowingly permitted Crawford to leave house arrest," *Doc.* 6 at ¶ 65, without electronic monitoring, *id.* at ¶ 100 (i), (j).

We, therefore, find that the Estate adequately pleads facts in support of its claim under the state-created-danger theory.  Resolution of this claim, especially the issues we have raised surrounding the applicable order or orders, depends upon the development of evidence through discovery; thus compelling our recommendation that Sabol's and the Probabtion/Parole Defendants' motion to dismiss the state-created-danger claim be denied.

## 2. Whether the Violated Right was "Clearly Established."

Having determined that Dowell's Estate fails to state a substantive due process claim against the Commissioners, we dispense with a discussion of the second element of the qualified immunity defense as to them. With respect to Sabol and the Probation/Parole Defendants, however, we must still decide whether "'it would be clear to a reasonable officer' that the [conduct alleged] was unlawful under the circumstances." *Lagano,* 769 F.3d at 859.

Based solely upon the allegations in the amended complaint, we cannot presently make such a determination. For instance, with respect to Sabol, we do not know what, if anything, she relied upon when Crawford was released on the same date that he was sentenced. In the same context, at this point in the case, we do not yet have a verifiable court order, only allegations in an amended complaint. Additionally, we do not know whether certain limitations or restrictions were in place when Crawford was permitted to leave his home on occasion, assuming that he was actually permitted to do so. Moreover, we do not know whether such conduct was even permitted for a person placed on house arrest in York County or, if it was permitted, how such a determination was made, and whether any tests normally used to make such a determination were implemented. Further, we do not know whether electronic monitoring was actually required for individuals sentenced to house arrest. As a result of these outstanding factual discrepancies,

we recommend that the qualified immunity defense be presently denied to Sabol and the Probation/Parole Defendants.

### F. Municipal Liability.

In Count II, Dowell's Estate raises a municipal-liability claim against York County and the Prison Board.  According to York County and the Prison Board, however, this claim too should be dismissed.  These defendants argue that: (1) the claim requires dismissal because the Estate has not sufficiently pleaded a constitutional violation against the individually-named defendants; (2) the Estate's suggested policies are "facially absurd," in that they would require municipal employees to "reinterpret and countermand judicial sentencing orders" having the effect of causing prisoners such as Crawford to be detained beyond their term of imprisonment; (3) the Estate has failed to, and cannot, demonstrate a pattern of unconstitutional conduct; (4) York County had no obligation or duty to train the Probation/Parole Defendants; and (5) the Prison Board is not a separate and distinct municipal entity subject to suit.  *Doc.* 9 at 15-16.

Under *Monell*, municipal liability generally arises when a constitutional transgression involves the implementation or the execution of a policy, regulation, or decision officially adopted by the governing body or informally adopted by custom. 436 U.S. at 690–91. A municipal policy is defined as a "'statement, ordinance, regulation, or decision officially adopted and promulgated by [a local

governing] body's officers.'" *Simmons v. City of Philadelphia*, 947 F.2d 1042, 1059 (3d Cir.1991) (alteration in original) (quoting *Monell*, 436 U.S. at 690). A municipal custom consists of "'such practices of state officials ... [that are] so permanent and well settled as to constitute a custom or usage with the force of law.'" *Id.* (alterations in original) (quoting *Monell*, 436 U.S. at 691).

In order to succeed on a claim of municipal liability brought pursuant to § 1983, a plaintiff must first identify a municipal policy or custom that led to the alleged constitutional violation.  The plaintiff must then "'[show] that, through its deliberate conduct, the municipality was the moving force behind the injury alleged.'" *Berg v. Cnty. of Allegheny*, 219 F.3d 261, 276 (3d Cir. 2000) (quoting *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 404 (1997)).  If "the policy or custom does not facially violate federal law, causation can be established only by 'demonstrat[ing] that the municipal action was taken with deliberate indifference as to its known or obvious consequences.'" *Id.* (alteration in original) (quoting *Brown*, 520 U.S. at 407, and citing *City of Canton v. Harris*, 489 U.S. 378, 389 (1989)).  As well, the Third Circuit has held that the failure to adopt a needed policy can result in municipal liability in an appropriate case, and has similarly analyzed that question of liability using a deliberate indifference standard.  *See Natale v. Camden Cnty. Corr. Facility*, 318 F.3d 575 (3d Cir. 2003).

In this context, deliberate indifference may be shown *via* allegations that policymakers were aware of constitutional deprivations and of alternatives for preventing them, "'but either deliberately choose not to pursue these alternatives or acquiesced in a long-standing policy or custom of inaction in this regard.'" *Beck v. City of Pittsburgh*, 89 F.3d at 966, 972 (3d Cir. 1996) (quoting *Simmons v. City of Philadelphia*, 947 F.2d 1042, 1064 (3d Cir. 1991)); *see also Brown*, 520 U.S. at 407 ("If a program does not prevent constitutional violations, municipal decision makers may eventually be put on notice that a new program is called for. Their continued adherence to an approach that they know or should know has failed to prevent tortious conduct by employees may establish the conscious disregard for the consequences of their action—the 'deliberate indifference'—necessary to trigger municipal liability." (citing *Harris*, 489 U.S. at 390 n. 10)).

Additionally, "[i]n limited circumstances, a local government's decision not to train [or supervise] certain employees about their legal duty to avoid violating citizens' rights may rise to the level of an official government policy for purposes of § 1983." *Connick v. Thompson*, 131 S.Ct. 1350, 1359 (2011). To state a claim against a municipal entity for its failure to train or supervise, the complaint must allege facts plausibly suggesting that the municipality's failure amounts to deliberate indifference. *Id.* (quoting *Harris*, 489 U.S. at 388). "A pattern of similar constitutional violations by untrained [or unsupervised] employees is 'ordinarily

necessary' to [show] deliberate indifference for purposes of failure to train." *Id.* at 1360 (quoting *Brown*, 520 U.S. at 409).  Absent a pattern of similar constitutional violations, a *Monell* claim premised on a failure-to-train theory may proceed if (1) a violation of federal rights may be a highly predictable consequence of a failure train officials to handle recurrent situations; and (2) the likelihood of recurrence and predictability of the violation of a citizen's rights "could justify a finding that [the] policymakers' decision not to train an officer reflected 'deliberate indifference' to the obvious consequence of the policymakers' choice—namely, a violation of a specific constitutional or statutory right." *Kline ex rel. Arndt v. Mansfield*, 255 F. App'x 624, 629 (3d Cir. 2007) (quoting *Brown*, 520 U.S. at 409).

As an initial matter, in resolving the defendants' motion to dismiss, we agree with York County that it had no obligation or duty to train the Probation/Parole Defendants since they are employees of the Commonwealth. *See Hayberger*, 551 F.3d at 198 (3d Cir. 2008)(emphasis added). Moreover, other than complaining about the Commissioners' alleged failure to sufficiently fund York County Probation/Parole Department and misleading both the courts and public, there are no allegations plausibly suggesting that York County exercised authority or control over the Department or its employees.

Next, with respect to the Prison Board's argument that it is not a separate, independent, party to be sued, we disagree.  Under Pennsylvania law, the Prison Board is the authorized policymaker of York County for the purposes of making policy decisions regarding the Prison.  *See* 61 Pa. C.S.A. §§ 1731(a)(3), 1732(b). Given its independent authority over the Prison, the Prison Board is the proper party to be sued for the policies and practices that may have amounted to a violation of federal law at the Prison.  York County should therefore be dismissed. *See Bradley v. Primecare Medical Inc.*, 3:12-CV-0292, 2013 WL 1149267, at * 6 (M.D. Pa. Mar. 19, 2013)(Nealon, J.)(applying *Monell* and providing that the Prison Board, not York County, is the proper defendant in this scenario given Pennsylvania's statutory scheme); *cf. Golya v. Golya,* No. 05-0100, 2007 WL 2301085, at *9 (M.D. Pa. Aug. 9, 2007)(Vanaskie, J.)(collecting cases and concluding that a local police department is merely a subunit of the local government and is not, itself, amenable to suit under § 1983).

Turning to the remaining arguments, we disagree that the Estate's municipal-liability claim should be dismissed because the Estate does not sufficiently plead a constitutional claim against the individually-named moving defendants.  As we have previously found and recommended, Dowell's Estate sufficiently states a constitutional claim for relief against Sabol and the Probation/Parole Defendants, under the state-created-danger theory.  At this stage,

where we are focused solely on the allegations in the amended complaint, without the added benefit of having a sufficient basis upon which to render a legal interpretation of Crawford's sentencing order, we also disagree with the defendants that the Estate's suggested policies and practices would necessarily require prisoners such as Crawford to serve sentences beyond the term imposed by a court or otherwise violate the rights of prisoners subject to a term of imprisonment.

In support of its municipal-liability claim against the Prison Board, the Estate alleges that the Prison Board (1) failed to properly supervise the Prison, resulting in the creation and implementation of policies and practices permitting dangerous inmates to be released to house arrest without proper electronic monitoring and supervision in place; (2) failed to implement policies and practices that would have ensured that crime victims were timely notified of the impending or actual release of dangerous inmates; and (3) failed to adopt policies and data management practices to ensure that affordable technological advancements would be implemented. *Doc.* 6 at ¶¶ 81, 82, 83-84. According to the Estate, technological advancements at the Prison would have properly alerted the Prison's decision makers that further precautions were required to ensure Dowell's safety before releasing Crawford, *id.* at ¶ 84; however, in this case the notes used at the prison were handwritten and often contained inaccurate or incorrect information about the inmates.

We also interpret the amended complaint to include allegations that the Prison Board failed to train the Prison employees on (1) the standards that must be met before releasing a knowingly dangerous inmate from the Prison; (2) the standards to keep victims of domestic violence safe; (3) the standards to comply with the Pennsylvania Statewide Automated Victim Information and Notification Act; and (4) the standards to comply with the Pennsylvania Crime Victims Act. *See id* at ¶¶ 108 (c), (e-g).  Indeed, the amended complaint includes allegations that the following policies and practices were in place at the Prison: (1) improper screening and assessment of inmates, which led to incorrect and inaccurate information being reported on the inmates; (2) a failure to coordinate with the York County Probation/Parole Department about post-release supervision prior to an inmate's release; and (3) a failure to warn crime victims and the York County Probation/Parole Department of an inmate's immediate or impending release. *See id.* at ¶¶ 38-39, 40-44, 49-51, 53.

Furthermore, to her detriment, Dowell allegedly believed that she would have been warned of Crawford's immediate or impending release, as part of the Prison's policies and customs.  The Estate, however, sets forth that she was not so warned or notified.  Last, the Estate alleges that a pattern of similar constitutional injuries existed, resulting from the Prison Board's policies and customs.  *See id.* at

¶¶ 114, 119.   The Estate's municipal-liability claim against the Prison Board should therefore proceed.

### G. Punitive Damages.

The individually named moving defendants, collectively, also seek dismissal of the Estate's request for punitive damages.  According to the defendants, the claim for punitive damages should be dismissed because they complied with Judge Bortner's order.  *Doc.* 9 at 17.  Dowell's Estate argues to the contrary, and contends that these defendants not only failed to comply with the Alleged Order, but that in light of the "significant injury" sustained by Dowell, further factual development is needed to support their claim for punitive damages.  *Doc.* 12 at 23.

In special circumstances, a plaintiff may recover punitive damages in a § 1983 action. *See Keenan v. City of Philadelphia*, 989 F.2d 459, 470 (3d Cir. 1992) (citing *Savarese v. Agriss*, 883 F.2d 1194, 1205 (3d Cir. 1985)).  A punitive damage award is appropriate "where the defendants have acted with a 'reckless or callous disregard of, or indifference to, the rights and safety of others.'" *Keenan*, 989 F.2d at 469 (quoting *Bennis v. Gable*, 823 F.2d 723, 734 (3d Cir. 1987)).  Alternatively, punitive damages may be recovered "if the [defendant's] conduct is intentional or motivated by evil motive." *Brennan v. Norton*, 350 F.3d 399, 429 (3d Cir. 2003) (quoting *Savarese*, 883 F.2d at 1204).

Here, although Dowell's Estate may ultimately be unable to establish the necessary conduct to justify an award of punitive damages, *see, e.g., Brennan*, 350 F.3d at 429–30 ("it is clear ... that punitive damages require more than the retaliatory motive itself"), at this stage of the litigation, "the issue is not whether Plaintiff will ultimately prevail but whether [Plaintiff] is entitled to offer evidence to support the claim." *Semerenko v. Cendant Corp.*, 223 F.3d 165, 173 (3d Cir. 2000) (quoting *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1420 (3d Cir. 1997).   Upon consideration, we find that the Estate's amended complaint sufficiently alleges claims that could result in punitive damages, depending upon what facts are adduced through discovery and presented at trial; therefore, we simultaneously find no basis to dismiss the claim for punitive damages at this early point in the litigation.

## IV.    Recommendations.[18]

For the foregoing reasons, **WE RECOMMEND** that:

(1) The moving defendants' motion to dismiss (*Doc.* 8) be **GRANTED** in part and **DENIED** in part as follows:

    a.   The moving defendants' motion to dismiss should be **GRANTED** to the extent that: (1) the wrongful-death claim is brought by the Fleckensteins, in their individual capacities, who lack standing to bring said claim under Pennsylvania law; and (2) Dowell's Estate fails to properly allege a state-created-danger claim against the Commissioners.

    b.   The moving defendants' motion to dismiss should be **DENIED** in all other respects.

(2) The plaintiffs should be granted leave to amend their wrongful-death claim.

(3) Because the Prison Board is the proper party to be sued under a theory of municipal liability, as to policies, practices, and customs at the Prison, York County should be **DISMISSED**.

---

[18]    Since plaintiffs, collectively, concede that Count III was raised, not as an independent claim, but as a mechanism through which the § 1983 claims are being raised, *Doc.* 12 at 6, and the Fleckensteins lack standing to bring a wrongful death claim in Count IV, we dispense with a discussion of supplemental jurisdiction and whether state sovereign or governmental immunities apply.

The Parties are further placed on notice that pursuant to Local Rule 72.3:

Any party may object to a magistrate judge's proposed findings, recommendations or report addressing a motion or matter described in 28 U.S.C. § 636 (b)(1)(B) or making a recommendation for the disposition of a prisoner case or a habeas corpus petition within fourteen  (14) days after being served with a copy thereof. Such party shall file with the clerk of court, and serve on the magistrate judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations or report to which objection is made and the basis for such objections. The briefing requirements set forth in Local Rule 72.2 shall apply. A judge shall make a de novo determination of those portions of the report or specified  proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge, however, need conduct a new hearing only in his or her discretion or where required by law, and may consider the record developed before the magistrate judge, making his or her own determination on the basis of that record. The judge may also receive further evidence, recall witnesses or recommit the matter to the magistrate judge with instructions.

Failure to file timely objections to the foregoing Report and Recommendation may constitute a waiver of any appellate rights.

Submitted this **26th** day of **February, 2015**.

**S/ Susan E. Schwab**
Susan E. Schwab
United States Magistrate Judge